Filed 8/2/23  P. v. Figueroa CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C096771 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE002358) |
| v. | |
| JEREMY J. FIGUEROA, | |
| Defendant and Appellant. | |

Defendant Jeremy J. Figueroa and his codefendant, Andres Campos, attacked a fellow inmate in the prison yard with inmate-manufactured weapons.  A jury found defendant guilty of assault with a deadly weapon and not guilty of attempted murder, but acquitted Campos on both charges.  Sentenced to 25 years to life, defendant argues on appeal the trial court erred in preventing Campos from testifying as to defendant's pre-attack hearsay statements to Campos (1) they should make the attack "look good"; and (2) it was not their intent to kill the other inmate.  He also argues we should remand the case for resentencing due to certain deficiencies in the probation report.  We will affirm.

1

## BACKGROUND

On December 3, 2018, Correctional Officer Chee Vang was on duty overseeing the prison yard at California State Prison–Sacramento. Officer Vang saw defendant and Campos grab and attack another inmate on the prison yard. Officer Vang ordered the inmates on the yard to get down on the ground. Despite this command, the two continued making stabbing motions at the victim while the victim tried to escape. After 15 to 20 seconds, defendant and Campos released their hold on the victim, walked away and laid down. The victim got up, moved away from the area where the attack occurred, and sat down. The prosecutor showed the jury a video showing the full attack which occurred over about 16 seconds. When inmates are out on the yard, there are approximately 200 to 300 men on the yard at any given time.

Officers found two inmate-manufactured weapons of sharpened steel; one near defendant and one near Campos.

Correctional Officer Keith Powers assisted the victim onto a gurney and transported him to the medical facility at the prison. The victim was bleeding from his head, arms, and upper torso area. Subsequently, prison officials transported the victim to an outside medical facility. Officer Powers testified inmates are generally transported to outside medical care for medically life-threatening injuries.

Campos testified he knew the victim prior to this assault and considered him a buddy. Campos testified he and the victim were both members of the "Southerners" prison gang. Campos described the Southerners as a " 'hierarchy' " organization similar to the military. Campos claimed to be a "regular dude" in this gang.

Campos said he was in trouble with the Southerners because he owed approximately $250 to another inmate for drugs, and it brought unwanted attention to the Southerners.

Another member of the Southerners confronted Campos about his drug and debt issue, and when Campos did not deny it, Campos was asked to segregate himself in a

2

restricted area in the basketball court. That segregation was a form of discipline. Campos did not believe he could disobey that restriction because to do so "could lead to very serious consequences."

A couple days later, a Southerner approached Campos and gave him an order. The person asked Campos if he could "assist the fellas with something that had to get taken care of." Campos believed he was being asked to "remove somebody" which meant the victim needed "to be taken care of in a sense of he can't be there no more." Again, Campos did not feel like he could refuse and agreed to do what he was asked. Campos received this order about five minutes before he carried it out. Shortly after he agreed to commit the crime, another person handed him a weapon.

A minute or two prior to the attack, Campos met with defendant at a restroom Campos described as "a neutral restroom area." Campos explained "neutral" meant the restrooms were race neutral. The trial court sustained hearsay objections to multiple questions posed by Campos' attorney about the contents of conversations between them about what they were going to do that day. Defendant's counsel did not object when the court sustained the hearsay objections.

Campos narrated the video of the attack to the jury and identified himself, the victim, and defendant. He showed the jury where he and defendant entered the frame of the video after having just left the "neutral" restrooms. Campos said he was not trying to kill the victim, but said, "you have to make it look good" to send a message. Campos testified he intended to mainly inflict body shots to the victim, but admitted the victim had been stabbed in the head and neck. Campos first said he did not stab him in the head and neck, but later conceded when the victim moved; Campos may have accidentally hit him in the head. Campos stated if he wanted to kill the victim, he would not have stopped until the officers applied force on him. But in this case, he stopped on his own. Defendant's attorney asked no questions of Campos on the stand, nor did he seek to

3

introduce any evidence through Campos as to what took place in the restroom immediately preceding the attack.

In rebuttal, the prosecution recalled Lieutenant Todd Manes. Lieutenant Manes testified if an inmate told the officers a stabbing is about to occur, the officers can place the inmate in protective custody for his own safety.

The first amended information charged defendant and Campos with attempted murder (Pen. Code, §§ 664/187, subd. (a))[1] and assault with a deadly weapon while confined in state prison. (§ 4501, subd. (a).) It also alleged defendant was eligible for a three strikes life sentence (§§ 667, subd. (e)(2), 1170.12, subd. (c)(2)) because he had three separate prior convictions: one assault with a deadly weapon in 2009 (§ 245, subd.(a)(1) and two murders in 2014 (§ 187, subd.(a)).

During the jury instruction conference after the close of evidence, counsel for Campos reminded the trial court he had attempted to elicit testimony on Campo's intent in the form of defendant's hearsay statements. He also argued this evidence was relevant to the aider and abettor instruction. As an offer of proof, counsel stated Campos would testify "that [defendant] agreed to make it look good, in the same type of terminology that . . . Campos used in his testimony, and that it was not their plan to kill." He argued this testimony was admissible under Evidence Code section 1250 to prove intent. When asked his thoughts on the issue, defendant's attorney said, "I am going to ponder this for a while." When the trial court indicated Campos' attorney wanted to put Campos back on the stand to testify to this conversation, defendant's counsel said that was a "great idea."

The trial court found, "I am not going to allow it for the reason that I think this is a classic [Evidence Code section] 1252 problem. [¶] How untrustworthy — it seems to be a very untrustworthy self-serving statement by a defendant to say basically I am not

---

[1] Undesignated statutory references are to the Penal Code.

4

guilty of attempted murder because in fact we had an agreement to not kill him. Our agreement was to simply stab him about — with well-placed stabs in his upper torso and head, and that seems patently absurd to me that they were placing their stabs in just the right place so that they would not actually kill him.· It doesn't seem likely.· It doesn't seem reasonable, and it seems like it lacks trustworthiness under [Evidence Code section] 1252."

The jury acquitted Campos on both charges. It found defendant not guilty of attempted murder (§§ 664/187, subd.(a)), but found him guilty of assault with a deadly weapon while confined in prison (§ 4501, subd. (a)). After a court trial, the trial court found the three prior strike convictions true.

Just prior to sentencing, defendant's counsel brought an oral motion under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. Counsel told the court defendant was currently serving a sentence of "190-some-odd years," had been in prison for seven years and this was the first time he got in trouble. Further, he argued, "an additional 25 to life is surplusage. It's unnecessary." As it related to the probation report, counsel stated, "the probation officer never even talked to him.· Never talked to him. Doesn't know anything about him. Apparently read his prior record, and then sort of went down the line making a silly recommendations of a $10,000 restitution fine, and all sorts of stuff that she must have read out of a book, and I think it's just silly." Counsel, however, did not request a supplemental probation report or make an offer of proof as to any relevant facts omitted from the report.

Defendant told the court, "I've been in prison seven, and this is like my first write-up. [¶] I don't talk back to the CO's [correctional officers].· I'm not a knucklehead in prison. . . . [¶] I am not saying I'm innocent and this. . . . The assault, yeah, I slipped up.· Who doesn't slip up in life, you know? [¶] But since I've been out of the hole I've been programming.· I got a job.· I am a porter.· I work every day with COs [correctional officers] doing my job. [¶] All I'm asking is, just be lenient.· I am not saying slap me on

5

the wrist and let me go, but I'm asking to not get 25 to life, Your Honor.· I have kids I want to raise, and I want to hopefully one day be out."

The trial court declined to strike defendant's prior strikes.  In making this ruling, the court recognized its discretion.  The trial court acknowledged defendant was 32 years old, but over the last twelve years had "a horrendous criminal history[.]"  The trial court stated, "It's not like you were born into a great situation in your life.  And it doesn't sound like you grew up in an area or in a place where you had a lot of options or a lot of choices, and I'm mindful of that.  [¶]  But people were shot.  People were killed.  You committed two murders.  I don't know anything about the victims, but I know that they are — they had a right to live.  And they have family, too, and you took that from them, so I look at that. . . . But it is horrendous what happened.  [¶]  In this case there is another man doing time in prison, and believe me, I listened to this evidence, and I know exactly what happened here.  I know you had orders to do what you did.  In a way you had very little choice either in that because of the gang that you are in.  But there was a man who could have been killed in this case as well, stabbed multiple times.  [¶]  I don't understand how the jury acquitted the other co-defendant, but he certainly was in it every bit as much as you were.· But they did acquit him.· But you almost killed a man here.  [¶] You did kill two other people.  And it was recent.  It was only in 2014.  This is only 2021.  [¶]  I look at your conduct in the past and in this case, which was horrible.  The best thing you have going for you is, you did go seven years apparently without any offenses, which is great.· But it's not like your offenses were burglary.  They were murders."

The trial court asked for any additional comments and when the parties demurred, the trial court sentenced defendant to 25 years to life pursuant to the three strikes law (§ 667, subd. (e)(2), 1170.12, subd. (c)(2)).

We deemed defendant's untimely filed notice of appeal as timely under the constructive filing doctrine.

6

DISCUSSION

A.    *Evidence Code section 1250*

Defendant argues the trial court erred in refusing to admit evidence of his statements to Campos that they agreed to make the assault "look good" and did not intend to kill the victim as evidence of his state of mind under Evidence Code section 1250.  We disagree.

Evidence Code section 1250, subdivision (a)(1) allows the admission of a hearsay statement offered to prove the declarant's state of mind "at that time or at any other time when it is itself an issue in the action."  This state of mind exception to the hearsay rule is inapplicable "if the statement was made under circumstances such as to indicate its lack of trustworthiness."  (Evid. Code, § 1252.)  " 'The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception.  Such an endeavor allows, in fact demands, the exercise of discretion.' "  (*People v. Edwards* (1991) 54 Cal.3d 787, 819-820 (*Edwards*).)[2]  " 'To be admissible under Evidence Code section 1252, statements must be made in a natural manner, and not under circumstances of suspicion, so that they carry the probability of trustworthiness.  Such declarations are admissible only when they are " 'made at a time when there was no motive to deceive.' " ' "  (*People v. Ervine* (2009) 47 Cal.4th 745, 778-779.)

Here, the trial court found the statements proffered were not trustworthy.  We "may overturn the trial court's finding regarding trustworthiness only if there is an abuse of discretion."  (*Edwards, supra*, 54 Cal.3d at p. 820.)  Under this standard, we will not disturb a trial court evidentiary ruling, "except on a showing the court exercised its

---

[2] *Edwards* was disapproved on other grounds by *People v. Diaz* (2015) 60 Cal.4th 1176, as recognized by *People v. McDaniel* (2021) 12 Cal.5th 97, 138.

discretion in an arbitrary, capricious[,] or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 10.)

Defendant urges defendant's statement was trustworthy because "he was talking to a person he knew and apparently trusted, not in suspicious circumstances or under any compulsion." The Attorney General counters, "[t]he two men were minutes away from carrying out an order given by the [Southerners] to publicly 'remove' an apparent rival. Given that a public stabbing in a prison yard will inevitably result in discipline or prosecution, the two men had a strong motive to manufacture evidence for their defense. Appellant had ample opportunity to reflect on his future defense because the stabbing was planned."

Neither party has cited a case with the precise facts before us, nor has our independent research uncovered any additional relevant authority. But, we draw guidance from two cases identifying relevant considerations to determine whether a hearsay statement is trustworthy or not. In *People v. Karis* (1988) 46 Cal.3d 612, 635, the defendant made a threat to kill witnesses to a friend at the friend's home during a regular social visit prior to the commission of the crimes. In that case, the appellate court concluded the trial court did not abuse its discretion in concluding the statement was trustworthy and thus not excludable under Evidence Code section 1252. (*Ibid.*) The appellate court observed that Evidence Code section 1252 requires exclusion only if the circumstances are such as to suggest that a statement is not trustworthy: There was no compulsion to speak, and there was no motive to lie or exaggerate.

On the other hand, in *Edwards,* the defendant made statements of remorse and wrote his thoughts in a notebook shortly after he was arrested for the crimes. (*Edwards, supra*, 54 Cal.3d at p. 818.) Under those circumstances, our Supreme Court concluded the trial court did not abuse its discretion in determining these statements were inherently untrustworthy, because at that time the defendant had a compelling motive to deceive and

8

seek to exonerate himself, or at least minimize his responsibility for the crimes. (*Id.* at p. 820.)

Here, we conclude the trial court did not abuse its discretion in finding these alleged statements between Campos and defendant, as testified to by Campos, proffered under Evidence Code section 1250 were untrustworthy under Evidence Code section 1252. While in deciding this issue the trial court may have placed some undue focus on Campos's reliability in determining the trustworthiness of the defendant's statement to him (see *People v. Riccardi* (2012) 54 Cal.4th 758, 821, abrogated on other grounds, *People v. Rangel* (2016) 62 Cal.4th 1192, 1216 [it is the motivation of the declarant, not the person testifying that is relevant]), we conclude the trial court's finding these statements were untrustworthy was not an abuse of discretion. The trial court could consider the sharp weapon used by the defendant during the attack, as well the conduct of the defendant attacking the victim as captured on the video showing the strikes to the victim's head and body by both Campos and defendant in assessing the trustworthiness of defendant's alleged statement in the restroom moments before the attack.

Additionally, defendant purportedly made these statements in a "neutral" and public prison restroom a minute or two before defendant and Campos marched out onto the yard and committed the assault. That restroom was in a prison yard filled with 200 to 300 inmates and open to all races. Thus, defendant did not make these statements to a friend in a natural manner or during a regular social visit. Instead, he allegedly made the statements made while the attack was imminent and under circumstances casting suspicion on the probability they were truthful. These facts suggest that defendant and Campos had a strong motive to manufacture evidence for their defense given their immediately impending certain capture and prosecution for the crimes they were about to commit in broad daylight in the prison yard under several pairs of eyes of guards. Defendant argues that this presupposes that they knew or suspected that one of them would take the stand and report the conversation in a later proceeding, and that this

9

prospect is too attenuated to make it an untrustworthy statement. We disagree. The public nature of the communal and neutral prison restroom raises the serious possibility other pairs of ears could hear this conversation. Although our analysis here differs slightly from that of the trial court, " ' "we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm." ' " (*People v. Brooks* (2017) 3 Cal.5th 1, 39.)

To the extent defendant argues he had a constitutional right to present this evidence, he is incorrect. The United States Constitution compels the admission of hearsay evidence only if the proponent shows the evidence is highly relevant to a critical issue and is sufficiently reliable. (*People v. Stanley* (1995) 10 Cal.4th 764, 839; *Edwards, supra*, 54 Cal.3d at pp. 820-821.) "The same lack of reliability that makes the statements excludable under state law makes them excludable under the federal Constitution." (*People v. Livaditis* (1992) 2 Cal.4th 759, 780.) Stated another way, " 'Although defendant had a constitutional right to have the jury hear all mitigating evidence counseling against the death penalty, "a capital defendant has no federal constitutional right to the admission of evidence lacking trustworthiness, particularly when the defendant seeks to put his own self-serving statements before the jury without subjecting himself to cross-examination." ' [Citation.] Thus, 'statements by a defendant to a third party regarding the defendant's state of mind can be admissible, but not when made under circumstances that indicate a lack of trustworthiness. (Evid. Code §§ 1250, 1252.)' [Citation.]" (*People v. Silveria* (2020) 10 Cal.5th 195, 284.)

As we have explained *ante,* the trial court did not abuse its discretion when it found defendant's statements untrustworthy. It properly excluded this evidence.

B.      *Probation Report*

Defendant argues the probation report failed to include the information required by the Rules of Court and thus we should remand the matter for resentencing. Defendant forfeited this objection.

Defendant argues the probation report in this case was deficient because it contained no statement from defendant, no information about his life because the probation officer failed to interview him, and no information about the circumstances of his prior offenses.  We agree the probation report was deficient in certain areas.  (§ 1203, subd. (b); Cal. Rules of Court, rule, 4.411.5, subd. (a)).  Under section 1203(b), the probation officer shall investigate and report to the court "upon the circumstances surrounding the crime and the prior history and record of the person, which may be considered either in aggravation or mitigation of punishment."  Additionally, our California Rules of Court specify that a probation officer's report must include, in relevant part, any statement made by the defendant to the officer including the defendant's account of the circumstances of the crime, relevant facts concerning the defendant's social history, and a reasoned discussion of aggravating and mitigating factors affecting the sentence length.  (Cal. Rules of Court, rule 4.411.5(a)(4), (6) and (9)(B).)

Defendant objected to the lack of information contained in the probation report when counsel brought its contents to the trial court's attention and said it was "just silly." That, however, was not enough to preserve the issue on appeal.  Defendant forfeited this point of error because he failed to make an offer of proof as to what information was missing from the report or ask the trial court to order the preparation of a supplemental probation report.  " '[T]he right to challenge a criminal sentence on appeal is not unrestricted.  In order to encourage prompt detection and correction of error, and to reduce the number of unnecessary appellate claims, reviewing courts have *required* parties to raise certain issues at the time of sentencing.  In such cases, lack of a timely and meaningful objection forfeits or waives the claim.  [Citations.]  These principles are invoked as a matter of policy to ensure the fair and orderly administration of justice. [Citation.]'  [Citation.]"  (*People v. Llamas* (1998) 67 Cal.App.4th 35, 38.)  "The statutory scheme obviously contemplates that all issues relevant to the probation

11

determination will be litigated in the sentencing court." (*People v. Welch* (1993) 5 Cal.4th 228, 234.) "[F]ailure to object and make an offer of proof at the sentencing hearing concerning alleged errors or omissions in the probation report waives the claim on appeal." (*Ibid.*; *Llamas,* at p. 39.) Alternatively, a defendant must request a supplemental probation report in the trial court or else forfeit the issue for appeal. (*People v. Johnson* (1999) 70 Cal.App.4th 1429, 1433; *People v. Begnaud* (1991) 235 Cal.App.3d 1548, 1556, fn. 7.)

Having neither made an offer of proof, nor requesting a supplemental probation report, defendant forfeited his complaint about the probation report's shortcomings.

DISPOSITION

The judgment is affirmed.

     /s/     <br>HORST, J.*

We concur:

  /s/   
HULL, Acting P. J.

  /s/   
ROBIE, J.

---

* Judge of the Placer County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.